### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JAMES JACKSON,<br>        Plaintiff,<br><br>        v.<br><br>BRIAN ROONEY, ET AL.<br>        Defendant. | No. 13-cv-1706 (VAB) |

### <u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, James Jackson, a former firefighter of Caucasian descent who was terminated by the City of Bridgeport for filing false insurance claims and a false police report following a burglary at his home, brought this case against his former employer, the City of Bridgeport (the "municipal Defendant"), its Fire Chief Brian Rooney, Deputy Fire Chief James Grace, and Mayor William Finch (collectively, the "individual Defendants"). Jackson alleges that the Defendants subjected him to discrimination, a hostile work environment, and retaliation by terminating him.

Specifically, Jackson claims that the Defendants do not discipline or terminate Black or Hispanic firefighters with more serious misconduct or criminal charges on their records. He asserts claims for violation of the equal protection and due process clauses of the United States Constitution under 42 U.S.C. § 1983 ("Section 1983"), Title VII of the Civil Rights Act ("Title VII"), the Connecticut Fair Employment Practices Act (the "CFEPA"), negligent supervision under Connecticut state law, intentional infliction of emotional distress, and municipal liability for the violation of his constitutional rights.

For the reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's claims arising under federal law. The Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I.   STATEMENT OF FACTS

Jackson, a Caucasian male, began working for the Bridgeport Fire Department ("BFD") on February 28, 2000. Def.'s Rule 56(a)(1) Statement ¶¶ 1-2, ECF No. 32-1.[1]   As a BFD firefighter, Jackson took an oath to uphold the Constitution of the United States, to uphold the laws of the State of Connecticut, to obey the Rules and Regulations of the BFD, and to obey the directives of his supervisors. *Id.* ¶ 3. He was terminated by the BFD on June 22, 2012. Termination Letter, Def.'s Ex. 1, ECF No. 32-3.

Before his termination, Jackson had two prior disciplinary incidents in his record. Termination Letter, Def.'s Ex. 1, ECF No. 32-3. On October 19, 2006, he received counseling concerning a citizen complaint about rude conduct and, on February 25, 2011, he received a written warning for insubordination. *Id.*

### A.   Plaintiff's Insurance Fraud and False Police Report

On the morning of October 31, 2011, Jackson reported a burglary at his home to the Naugatuck police department. October 2011 Police Report at 1, Def.'s Ex. 3, ECF No. 32-3.

---

[1] The failure of both parties to adhere fully to the requirements of Local Rule of Civil Procedure 56(a) complicated the Court's ability to compile the factual background from the record. Numbered paragraphs in the Defendants' Local Rule 56(a)(1) Statement typically contained multiple statements of fact. Many individual statements of fact also were not followed by a citation to the record and, where a citation was available, many of the citations did not refer to specific paragraphs or pages. These deficiencies on Defendants' part are sufficient grounds to justify denying the motion for summary judgment. *See* Local Rule of Civil Procedure 56(a)(3) ("[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in ... denying the motion for summary judgment."); *Tross v. Ritz Carlton Hotel Co. LLC*, 928 F.Supp.2d 498, 503–04 (D.Conn. 2013) ("In this Circuit, a movant's failure to comply with a district court's relevant local rules on a motion for summary judgment permits, but does not require, a court to dispose of that motion."). Plaintiffs' Local Rule 56(a)(2) Statement was also deficient in failing to cite to specific paragraphs or pages of exhibits in the record.

There had been a winter storm the night before.  Def.'s Ex. 4, ECF No. 32-3.  Jackson reported

that the following items were stolen: a 2004 Old Dog chopper motorcycle, a Troybuilt

lawnmower, an Echo gas blower, a Ryobi gas trimmer, several carpenters' tools, a Keurig coffee

maker, two LCD televisions, a DirecTV receiver, a Gateway laptop, and a Gateway printer.

October 2011 Police Report at 1, Def.'s Ex. 3, ECF No. 32-3.  The officer at the scene reported

that it appeared as if the burglars entered the kitchen by smashing out the doorknob and lock of

the kitchen door with a sledgehammer that the officer found in the garage.  *Id.*  The officer did

not find any fingerprints at the scene or on the sledgehammer.  *Id.*

Within two days of filing the October 31, 2011 police report, Jackson began filing

insurance claims on items that were allegedly stolen from his home.  SBMA Trans. May 1, 2013

531:2-8, Def.'s Ex. 14, ECF No. 32-4.  He received $15,254 from Progressive for the allegedly

stolen motorcycle.  SBMA Award at 4, Def.'s Ex. 9, ECF No. 32-3.  He received $8,800.13 from

Met Life on his homeowner's insurance claim.  April 2012 Police Report at 5, Def.'s Ex. 3, ECF

No. 32-3.

On March 20, 2012 and April 13, 2012, the Naugatuck police received anonymous emails

claiming that Jackson staged the burglary to make fraudulent insurance claims, took apart his

motorcycle to hide it, and built a false wall in his basement to hide the allegedly stolen items.

April 2012 Police Report at 1-2, Def.'s Ex. 3, ECF No. 32-3.  Two police officers went to

Jackson's home on April 18, 2012 to investigate.  *Id.* at 3.  Jackson confessed to the Naugatuck

police that he had "padded his insurance claims" by making false claims on several items which

had not actually been stolen.  *Id.*  Jackson maintained that he was the victim of an actual burglary

and that he then "received some advise [sic] from his coworkers that told him to add items to his

insurance claim" to get extra money.  *Id.*  His motorcycle, paint sprayer, portable air conditioner,

blender, and printer were not actually stolen.  *Id.*  Instead, he had taken apart his motorcycle and hid the pieces, along with the rest of the items, under the basement stairs.  *Id.*  The police obtained an arrest warrant on May 17, 2012 and arrested Jackson on May 18, 2012.  Arrest Warrant at 1-2, Def.'s Ex. 3, ECF No. 32-3.

After Jackson confessed, he retracted his insurance claims and made restitution to the insurance companies.  Due Process Hearing Trans. at 7, Def.'s Ex. 7, ECF No. 32-3.  Jackson returned the $15,254 that he received for the motorcycle.  SBMA Award at 4, Def.'s Ex. 9, ECF No. 32-3.  Of the $8,800.13 he received from his homeowner's insurance, he returned $7,024.61, representing compensation for the allegedly stolen property, and kept $1,788.89, representing compensation for damage to his home.  *Id.*

### B.      Publicity and Plaintiff's Termination

Journalists from local television news networks, including NBC Connecticut, WFSB Eyewitness News 3, and WTNH News 8, reported Jackson's insurance fraud and his arrest. Def.'s Ex. 4, ECF No. 32-3.  The news coverage emphasized that Jackson was a BFD firefighter. Due Process Hearing Trans. at 18, Def.'s Ex. 7, ECF No. 32-3.  Fire Chief Rooney learned of this matter while watching the news and he described the coverage as "an embarrassment." SBMA Award at 3, Def.'s Ex. 9, ECF No. 32-3.

In a letter dated May 22, 2012 and signed by Deputy Fire Chief Grace, the BFD notified Jackson that he was being put on Administrative Leave as of May 21, 2012.  Leave Letter, Def.'s Ex. 5, ECF No. ECF No. 32-3.  The letter notified Jackson that the BFD was conducting an investigation into his arrest in connection with his false police report.  *Id.*  Fire Chief Rooney testifies that he was the only person involved in deciding whether Jackson violated BFD or City

rules in the investigation and administrative hearing process leading to his termination.  SBMA Trans. Feb. 13, 2013 238:23-239:1, Pl.'s Ex. 1, ECF No. 42-3.

An investigation hearing occurred on June 4, 2012, and Jackson made no comment.  Due Process Hearing Letter, Def.'s Ex. 6, ECF No. 32-3.  In a second letter dated June 8, 2012 and signed by Fire Chief Rooney, the BFD notified Jackson of the charges against him for violating the BFD Rule and Regulations Sections 17.18, 17.41, and 17.45; the City of Bridgeport Work Rules and Regulations, Numbers 9, 17, and 18; and the City of Bridgeport Code of Ethics.  *Id.* The text of these rules was appended to the letter.  *Id.*  The letter also gave Jackson notice that he was required to attend a due process hearing on June 13, 2012, where he could rebut the charges against him, and that, if he failed to attend, he could face disciplinary consequences up to and including the termination of his employment.  *Id.*

The due process hearing took place on June 14, 2012.  Due Process Hearing Trans. at 1, Def.'s Ex. 7, ECF No. 32-3.  Jackson appeared at the June 14 due process hearing with his union attorney, John Robert Gulash.  *Id.*; SBMA Award at 3, Def.'s Ex. 9, ECF No. 32-3.  Fire Chief Rooney, Deputy Fire Chief Grace, the BFD's attorney John Bohannon, Labor Relations Officer Philip White, the City of Bridgeport Director of Labor Relations Lawrence Osborne, and Dan Hunsberger from the union also attended the hearing.  Due Process Hearing Trans. at 1, Def.'s Ex. 7, ECF No. 32-3.  At the outset, Attorney Bohannon read Jackson his *Garrity v. State of N.J.*, 385 U.S. 493 (1967) warning.[2]  *Id.* at 2.  The warning read as follows:

> Mr. Jackson, you are hereby advised that this interview is for administrative purposes only and as a public servant you are obligated to answer questions relative to your employment.  Any and all statements made by you during the course of this interview cannot be utilized in any criminal proceeding which may be currently pending or may be initiated against you regarding this

---

[2] *Garrity v. State of N.J.*, 385 U.S. 493, 500 (1967) (holding that testimony of public employees elicited during internal or administrative investigations "under threat of removal from office" cannot be used in "subsequent criminal proceedings")

investigation.  Failure to answer any questions truthfully, presented to you during the course of this interview, will subject you to a separate charge of insubordination.

*Id.*  Jackson acknowledged that he understood the warning and apologized to Fire Chief Rooney for the negative attention that he had brought to the BFD.  *Id.*

Jackson recounted the events surrounding the false police report and insurance claims. Due Process Hearing Transcript at 3-6, 9-14, Def.'s Ex. 7, ECF No. 32-3.  He also clarified that, while he told the police that a colleague had advised him to pad his insurance claims, it was actually a social acquaintance, not a colleague, who had advised him.  *Id.* at 4, 7.  He then revised his story and stated that he had spoken to colleague Lieutenant Morotto about the robbery, and that Lt. Morotto asked if he had receipts and records recording the value of the stolen items.  *Id.* at 14-15.  Jackson came away with the impression that he could suffer a "substantial unreimbursed loss" based on not having such records, and he testified that he then "made that horrible mistake" of making the false police report and the insurance claims.  *Id.* at 15-16.  He stated that he "didn't spend the money" and "didn't need the money" that he received from the insurance companies.  *Id.* at 16.  At the hearing, Jackson informed the panel that he was making restitution to the insurance companies.  *Id.* at 7-8.

During the hearing, Fire Chief Rooney pressed Jackson on whether he had staged the entire robbery, rephrasing the question around four times.  Due Process Hearing Transcript at 12, Def.'s Ex. 7, ECF No. 32-3.  Fire Chief Rooney commented that there was an issue of "credibility."  *Id.*

Towards the end of the hearing, Jackson stated that "when I made the decision to do it I regretted the minute [the police officer] called in that plate" for his motorcycle.  Due Process Hearing Transcript at 17, Def.'s Ex. 7, ECF No. 32-3.  Fire Chief Rooney pointed out that

6

Jackson could have confessed much sooner, and Jackson admitted that was true.  *Id.*  Jackson then repeated that he had made a mistake and was glad that he "cooperated 100% with the police" in April 2012, after they began questioning him regarding whether his motorcycle was actually stolen.  *Id.* at 18.  Deputy Fire Chief Grace commented that, while Jackson was saying that he knew he had done something wrong, he had not confessed until he was caught.  *Id.* at 17. Labor Relations Director Osborn asked Jackson whether the local news networks were aware that he was a firefighter, and Jackson answered yes, the news reports generally mentioned that he was a firefighter.  *Id.* at 18-19.

Following the due process hearing, Fire Chief Rooney sent Jackson a letter, dated June 22, 2012, notifying him of his termination.  SBMA Award at 3, Def.'s Ex. 9, ECF No. 32-3; Termination Letter, Def.'s Ex. 1, ECF No. 32-3.  The letter stated that, taking into account the facts Jackson presented at the hearing, the BFD found that he had violated all of the BFD and City of Bridgeport rules cited in the May 22, 2012 Administrative Leave letter.  Termination Letter, Def.'s Ex. 1, ECF No. 32-3.

Among other comments, the letter notes that Jackson's apologies during the hearing were "of little concern when you fraudulently contributed to the burglary at your home," that his actions in initially depositing the insurance checks were a "clear example of your intent to fully carry out your plan to bilk the insurance companies," and that his claims that he "felt bad about lying to the police and insurance companies" were "absolutely outrageous."  Termination Letter, Def.'s Ex. 1, ECF No. 32-3.  The termination letter goes on to state that, as public servants, members of the BFD must demonstrate the highest standards of ethical conduct both on and off duty, so that "the public may have trust and confidence in your presence when entering homes and businesses."  *Id.*  Fire Chief Rooney claims that Jackson's misconduct combined with the

publicity left the BFD with no choice but to terminate him.  SBMA Award at 4, Def.'s Ex. 9, ECF No. 32-3.

Jackson resolved the criminal case against him on October 18, 2012, with a plea of *nolo contedere* to the charge of false reporting of an incident in the second degree, after he was already terminated from the BFD.  Plea Trans.1:22-25, 3:5-8, Def.'s Ex. 12, ECF No. 32-4; SBMA Award at 4, Def.'s Ex. 9, ECF No. 32-3.  The Connecticut Superior Court sentenced Jackson to a one-year suspended sentence and two years conditional discharge.  Plea Trans. 8:3-10, Def.'s Ex. 12, ECF No. 32-4.

### C.    Grievance Proceedings

After Jackson's termination, his union, the IAFF Local 834, filed a grievance under the procedures outlined in its collective bargaining agreement.  Def.'s Local Rule 56(a)(1) Statement ¶ 39, ECF No. 32-1.  The Connecticut State Board of Mediation and Arbitration ("SBMA") commenced a hearing on January 14, 2013.  *Id.* ¶ 40.  The SBMA conducted six evidentiary hearings and accepted extensive briefing from the parties.  *Id.* ¶ 41.  The SBMA denied the grievance and found that Jackson was terminated for just cause.  SBMA Award at 12, Def.'s Ex. 9, ECF No. 32-3.

The union filed an application to vacate the SBMA's award with the Connecticut Superior Court.  Def.'s Local Rule 56(a)(1) Statement ¶ 42, ECF No. 32-1.  The Superior Court upheld the SBMA award on August 1, 2014, finding no violation of public policy and that the City of Bridgeport could terminate Jackson for his criminal conduct even if the City did not have a *per se* rule of dismissal and the criminal conduct at issue was off-duty.  Superior Court Decision at 12-13, Def.'s Ex. 10, ECF No. 32-3.

### D.     Defendant's Treatment of Other Firefighters

Jackson claims that Black and Hispanic BFD employees with similar or more serious

disciplinary problems or criminal charges on their records were treated more favorably than he

was and not terminated or charged with the same violations of BFD or City of Bridgeport rules.

Compl. ¶¶ 28-31, ECF No. 1; Pl.'s Br. 7, ECF No. 42-1.  He alleges that this is evidence of race

discrimination.  Compl. ¶¶ 28-31, ECF No. 1.

Jackson points to evidence that the following Black employees had various disciplinary

problems arising from on-duty conduct, but were never arrested and did not face criminal

charges for the underlying conduct and ultimately were not terminated:

- **Harold Clarke**: Clarke is Black. Pl.'s Ex. 10, ECF No. 42-12.  The BFD suspended him for 30 days without pay on June 27, 2012 for driving a fire engine on duty with a suspended license on three occasions and misrepresenting that he had a license on an official Driving History Questionnaire form on one occasion.  Clarke Disciplinary File, Pl.'s Ex. 4, ECF No. 42-6.  The BFD also told him not to return to work until he had a valid driver's license.  *Id.*  The BFD reinstated Clarke on July 20, 2012, several days early. *Id.*
- **James Grace**: Deputy Fire Chief Grace is Black. Pl.'s Ex. 10, ECF No. 42-12.  The BFD issued him a letter on April 21, 2009 regarding his being under the influence of alcohol while on duty.  Grace Disciplinary File, Pl.'s Ex. 6, ECF No. 42-8.  The letter documented one incident in January 2009 and two in April 2009 when other employees reported that Deputy Fire Chief Grace was under the influence of alcohol at work.  *Id.*  The letter indicated that the BFD was not taking disciplinary action, but advised Deputy Fire Chief Grace to consider the Employee Assistance Program ("EAP") and warned that his behavior was unacceptable.  *Id.*
- **Joel Christy**: Christy is Black.  Pl.'s Ex. 10, ECF No. 42-12.  He had a lengthy history of BFD disciplinary action because he was frequently belligerent to superior officers while on duty.  Christy Disciplinary File, Pl.'s Ex. 5, ECF No. 42-7.  On April 11, 1997, he was suspended for 30 days without pay following a due process hearing.  *Id.* at 7.  Christy had refused to obey his superior officer, John Currivan, assaulted Currivan, and threatened Currivan and another superior officer.  *Id.* at 10-11.  On June 23, 2008, he was suspended without pay for one day following an incident where he was insubordinate to a superior officer on April 11, 2008.  *Id.* at 12-13.  In January 2013, the BFD conducted an investigation after Christy complained that Captain Francisco Rivera was subjecting him to a hostile work environment, but Christy retracted his accusations.  *Id.* at 2-3.  The BFD found, after a due process hearing, that Christy's "spurious allegations" were baseless.  *Id.* at 5.  Christy was given a verbal warning.  *Id.* at 6

Jackson points to evidence that the following Black employees were arrested for off-duty conduct, but were not terminated:

- **Allen Jones**: Jones is Black.  Pl.'s Ex. 10, ECF No. 42-12.  His niece, Kesheonia Courts, had an order of protection against him.  Jones Disciplinary File at 8, Pl.'s Ex. 7, ECF No. 42-9.  The BFD has three records, spanning the period from March through April 2012, of Courts informing the BFD about incidents when Jones violated the order.  *Id.* at 6-9.  Jones typically wore his uniform during these altercations, but the BFD considered them a private family matter.  *Id.* at 8-9.  On April 3, 2012, Courts called the Bridgeport Police Department ("BPD") when Jones violated the order.  *Id.* at 5.  BPD officers arrested Jones.  *Id.* at 4.  On May 11, 2012, the BFD sent Jones a letter informing him that he needed to attend a Due Process Hearing regarding his arrest and resulting violations of the BFD Rules and Regulations Sections 17.18 and 17.41. Id. at 4.  The BFD eventually issued him a written warning. *Id.* at 1.
- **James Cook**: Cook is Black.  Pl.'s Ex. 10, ECF No. 42-12.  On July 2, 2008, he was arrested in relation to several motor vehicle offenses, including operating an unregistered motor vehicle, and failure to appear for his court date.  James Cook Docket, Pl.'s Ex. 9, ECF No. 42-11.[3]  Cook allegedly did not receive any disciplinary consequences from BFD for this conduct. Pl.'s Ex. 11 at 3, ECF No. 42-13.[4]  Jackson alleges that Cook's offenses occurred off-duty, but this is unsubstantiated in the record.  Pl.'s Rule 56(a)(2) Statement at 19, ECF No. 42-2.
- **Ronald Reed**: Reed is Black.  Voccola Dep. 99:4-6, Pl.'s Ex. 14, ECF No. 42-16.  He was previously arrested in 2009 for disorderly conduct and in 2010 for reckless endangerment and criminal mischief.  Reed Docket, Pl.'s Ex. 8, ECF No. 42-10.  He pled guilty to both sets of charges.  Reed Docket, Pl.'s Ex. 8, ECF No. 42-10.  He received a suspended sentence and fine in for the 2009 incident and unconditional discharge for the 2010 incident.  Reed Hearing Trans. at 2-3, Pl.'s Ex. 8, ECF No. 42-10.  Reed did not report these arrests to the BFD, and the BFD was not aware of these arrests until 2013.  *Id.* at 1.  The only BFD disciplinary proceeding that Reed went through was an informal investigative hearing that took place in BFD headquarters with Deputy Fire Chief Grace, Reed's attorney, Reed, and Robert Whitbread from the union.  *Id.*  At the hearing, Reed explained that both cases were related to a custody battle with his child's mother, who at one point had "a convicted criminal crash into my car," resulting in injuries to Reed.  *Id.* at 2.  At some point, a judge had told Reed that he "didn't feel that [Reed] was aggressive to her at all" and given Reed an unconditional discharge, possibly in relation to the 2010 incident.[5]  *Id.*  Reed's attorney clarified that both incidents were related to the "domestic situation where [Reed] was trying to exercise his custodial rights" as a parent.  *Id.* at 3.

---

[3] This exhibit is a cut-off screenshot from a mobile device.  It is unclear what website the information comes from or if the information is complete.

[4] This exhibit is a chart listing BFD employees, their rank, their race, and whether they had received certain types of disciplinary consequences for certain types of disciplinary problems.  It does not contain information about the date range covered by the chart, nor does it explain whether this chart is an exhaustive and complete list of all disciplinary consequences for all BFD employees.

[5] Reed's explanations of his conduct in this portion of the transcript are unclear, but Deputy Fire Chief Grace appears to have accepted these explanations.

Reed had gone to "programs," "different counselors," and "EAP regarding her and handled the matter the way I was supposed to." *Id.*  The only disciplinary action that Reed received was a "non-disciplinary memo of coaching and counseling."  Reed Memo. of Counseling, Pl.'s Ex. 8, ECF No. 42-10.

Jackson alleges that the following Black or Hispanic employees were arrested, faced criminal charges, or both for off-duty conduct without being terminated[6]:

- **Maurice Barnes**: Barnes is Black.  Pl.'s Ex. 10, ECF No. 42-12.  Jackson claims that he had criminal charges pending against him, but does not cite to anything in the record. Pl.'s Rule 56(a)(2) Statement at 20, ECF No. 42-2.  Jackson does not specify whether the alleged criminal conduct occurred on or off duty.  *Id.*  Jackson claims that Barnes received no BFD disciplinary action for the alleged criminal charges. Pl.'s Ex. 11, ECF No. 42-13.[7]
- **Phillip Rosa**[8]: Rosa is Hispanic.  Pl. Local Rule 56(a)(2) Statement at 20, ECF No. 42-2. He received multiple DUI convictions and was jailed for 30 days upon his third conviction.  *Id.*; Def.'s Rule 56(a)(1) Statement ¶ 76.   Rosa was allegedly incarcerated for a year upon receiving his fourth DUI conviction, and he was terminated on December 29, 2005 after requesting a leave of absence from the BFD to serve his sentence.  Pl. Local Rule 56(a)(2) Statement at 20-21, ECF No. 42-2; Def.'s Rule 56(a)(1) Statement ¶ 76.  The Defendants maintain that the BFD was not aware of any of Rosa's prior convictions or previous incarceration until he requested the leave of absence.  Def.'s Rule 56(a)(1) Statement ¶ 76.  Jackson does not specify whether Rosa's alleged DUI convictions involved on or off duty conduct.  Pl. Local Rule 56(a)(2) Statement at 20, ECF No. 42-2.

Jackson claims that the only BFD firefighters ever terminated for "off duty conduct not related to drug abuse" are himself and Edward Voccola, both of whom are Caucasian.  Pl.'s Br.

---

[6] None of Mr. Jackson's allegations regarding these individuals' alleged criminal conduct are supported with admissible evidence, so these allegations are insufficient to allow his claims to survive summary judgment. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."). For Barnes, there is no evidence in the record regarding the alleged conduct. For Rosa, the only cited evidence of the alleged conduct comes from the testimony of another terminated firefighter, Edward Voccola, from when Voccola was litigating a similar discrimination claim to Jackson's in *Voccola v. Rooney*, 136 F. Supp. 3d 197 (D. Conn. 2015).

[7] This is the same exhibit discussed in footnote 4 above.

[8] While Jackson cites to various portions of the deposition of Voccola, the cited portions of the transcript do not appear to contain details about Rosa's convictions of disciplinary history.  The Defendants do not dispute that Rosa had multiple DUI convictions and that he was terminated, but they cite to an exhibit that does not exist.  Def.'s Rule 56(a)(1) Statement ¶ 76.

9, ECF No. 42-1.[9]  Voccola attempted to poison his neighbors by pouring muriatic acid and other

chemicals into their water filtration system.  *Voccola v. Rooney*, 136 F. Supp. 3d 197, 201 (D.

Conn. 2015).  He was arrested and charged with second-degree attempted assault of an elderly

person and first-degree reckless endangerment.  *Id.*  The Connecticut Post published three

articles on Voccola's conduct in September 2010, and the coverage noted that he was a

firefighter.  Voccola Dep. 128:18-22, Pl.'s Ex. 14, ECF No. 42-16.  Fire Chief Rooney

terminated Voccola for violating the BFD Rules and Regulations and those of the City of

Bridgeport.  *Voccola*, 136 F. Supp. 3d at 203.

## II.    STANDARD OF REVIEW

The Court will grant a motion for summary judgment if it determines that there is no

genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine dispute of

material fact exists.  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000).  Once the

moving party has satisfied that burden, the nonmoving party "must set forth specific facts

demonstrating that there is a genuine issue for trial" in order to defeat the motion for summary

judgment.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks

omitted).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. Of Syracuse Univ.*,

453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamic Co.*, 158 F.3d 622, 626 (2d

Cir. 1998).  The substantive law governing the case identifies which facts are material, and "only

disputes over facts that might affect the outcome of the suit under the governing law will

---

[9] The cited portion of the record directly contradicts this claim, as it also mentions Stanley Golob, a BFD officer of unknown ethnicity who was terminated in the 1960s or 1970s after shooting his wife.  SBMA Hearing Trans. Feb. 21, 2013 346:16-21, Pl.'s Ex. 2, ECF No. 42-4.

properly preclude the entry of summary judgment." *Boubolis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On summary judgment, the court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). When reviewing the record on a motion for summary judgment, the Court must "assess the record in the light most favorable to the non-movant" and "draw all reasonable inferences in the non-movant's favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks omitted). Inferences drawn in favor of the nonmovant must, however, be supported by evidence, and the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to defeat summary judgment. *Liberty Lobby*, 477 U.S. at 252. "Conclusory allegations, conjecture, and speculation" are insufficient to create genuine issues of material fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (internal quotation marks omitted). If no reasonable jury "could find in favor of the [nonmovant] because the evidence to support its case is so slight, there is no genuine issue of material fact," then a grant of summary judgment is proper. *Gallo*, 22 F.3d at 1224.

## III.   DISCUSSION

Plaintiff's Complaint brings claims under seven counts alleging that the Defendant's subjected Jackson to discrimination, a hostile work environment, and retaliation in violation of various federal and Connecticut state laws. ECF No. 1. Count One alleges that the Defendants violated the Equal Protection Clause of the United States Constitution through an action under 42 U.S.C. § 1983. Compl. 12, ECF No. 1. Count Two alleges that Defendants violated the Due

Process Clause of the United States Constitution. *Id.* Count Three alleges that the defendants violated Title VII. *Id.* at 13. Count Four alleges that defendants violated provisions of the CFEPA, C.G.S.A. § 46a-60 *et seq*. *Id.* Count Five alleges that the defendants are liable for negligent supervision under Connecticut common law. *Id.* at 14. Count Six alleges that the Defendants are liable for intentional infliction of emotional distress under Connecticut common law. *Id.* at 15. Count Seven alleges that the City of Bridgeport has incurred municipal liability. *Id.* at 16. Defendants move for summary judgment on all counts of the Plaintiff's complaint. ECF No. 32.

For the reasons discussed below, the Court **GRANTS** the Defendant's Motion for Summary Judgment as to Plaintiff's claims arising under federal law. The Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## A.    Equal Protection and Title VII

The Equal Protection Clause of the Fourteenth Amendment protects public employees from race discrimination and retaliation for complaining about race discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015). Public employees may bring discrimination and retaliation claims under 42 U.S.C. § 1983 against "responsible persons acting under color of state law." *Id.* at 87. Any state employee "acting in his official capacity" acts "under color of state law." *Id.* at 88 (internal quotation marks omitted). With the color of law requirement met, as it was in this case because the individual defendants acted in an official capacity when investigating and eventually terminating Jackson, a "plaintiff's equal protection claim parallels his Title VII claim, except that a [Section 1983] claim, unlike a Title VII claim, can be brought against an individual." *Id.* Jackson claims that the Defendants discriminated

against him by wrongfully terminating him, creating a hostile work environment, and retaliating against him.

As an initial matter, Title VII "does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers." *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) (internal quotation marks omitted). Accordingly, Jackson's Title VII claims fail as to individual Defendants, but survive as to the municipal Defendant, the City of Bridgeport.

An individual, meanwhile, may only be held liable under Section 1983 "if that individual is personally involved in the alleged deprivation." *Littlejohn*, 795 F.3d at 314 (internal quotation marks omitted). The record demonstrates that Fire Chief Rooney was the primary decisionmaker responsible for deciding whether Jackson had violated BFD or City rules in the investigation and administrative hearing procedure that led to Jackson's termination. SBMA Hearing Trans. Feb. 13, 2013 238:23-239:1, Pl.'s Ex. 1, ECF No. 42-3. Deputy Fire Chief Grace attended the due process hearing and signed the letter notifying Jackson that he was being placed on administrative leave. Leave Letter, Def.'s Ex. 5, ECF No. ECF No. 32-3; Due Process Hearing Transcr. at 17, Def.'s Ex. 7, ECF No. 32-3. Jackson alleges that Mayor Finch was grossly negligent in supervising Fire Chief Rooney and Deputy Fire Chief Grace, but the record does not support this argument or indicate that Mayor Finch personally participated in the investigation and procedure leading to his termination. As a result, the Section 1983 claims against Mayor Finch also fail.

### 1. Wrongful Termination

Jackson's claims alleging racial discrimination and disparate treatment throughout his termination process can be analyzed as a single discrete act. *Voccola*, 136 F. Supp. 3d at 205.

The claims are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, a plaintiff must first establish a prima facie case of intentional discrimination by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination."  *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (internal quotation marks omitted).  Once the plaintiff makes out his prima facie case, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action."  *Id.*  The burden then shifts back to the plaintiff to demonstrate that "the employer's explanation is a pretext for race discrimination" and that race was the real reason for the adverse action.  *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014).  To make this showing, the plaintiff must demonstrate that "circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination."  *Id.* (internal quotation marks omitted).

To make a showing of disparate treatment as part of a prima facie case, a plaintiff must show that he is "similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself]."  *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).  "What constitutes all material respects . . . varies," but a court must evaluate "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (internal quotation marks omitted).  While the comparator's situation need not be functionally identical to that of the plaintiff, "[t]he standard for comparing conduct requires a reasonably close

resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010).  Although the question of whether comparators are similarly situated is typically a question of fact for the jury, a court may "properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. Of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001).

In cases involving allegations of disparate treatment in workplace disciplinary proceedings, a comparator's underlying misconduct must be substantially similar that of the plaintiff.  *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (finding in dicta that plaintiff making Title VII and Section 1983 equal protection claim needed to point to comparators of other races who were not suspended despite also being at "the center of a missing persons investigation" and exhibiting "behavior comparable to his" in that context); *Ruiz*, 609 F.3d at 495 (explaining that none of plaintiff's comparators were similarly situated partially because none of them "were accused of sexual harassment, sexual abuse and rape" like plaintiff); *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008) ("A comparator is an employee similarly situated to the plaintiff in all relevant respects. The quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.") (internal quotation marks omitted)).

Defendants argue that Jackson cannot make out his prima facie case and that he cannot show that his termination took place under circumstances giving rise to the inference of discrimination because the Black and Hispanic employees that he compares himself to are not similarly situated to him. Def.'s Br. 22-23, ECF No. 32-2.   Because there is no admissible evidence in the record as to some of the comparators and because none of Jackson's remaining

alleged comparators are similarly situated to him, Jackson cannot make out a prima facie case regarding disparate treatment in his termination.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). While disputes as to the validity and weight of the evidence are for the jury, "questions of admissibility are properly resolved by the court." *Id.* When deciding a summary judgment motion, the Court "has broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009). The rules governing admissibility of evidence are the same at the summary judgment stage as they are during trial. *See id.* ("The principles governing admissibility of evidence do not change on a motion for summary judgment.") (quoting *Raskin*, 125 F.3d at 65-55). Indeed, "[t]he resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury." *Raskin*, 125 F.3d at 66; *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) ("[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation."). In the absence of evidence, "conclusory allegations of discrimination are insufficient" to allow a plaintiff's discrimination claim to survive summary judgment. *Meiri*, 759 F.2d at 998.

To make out his disparate treatment claim, Jackson points to eight Black or Hispanic BFD employees as possible comparators who were allegedly treated less harshly and generally not terminated for misconduct that he alleges was similarly serious to his own. There is no admissible evidence in the record for two of these potential comparators, Barnes and Rosa, and they cannot therefore be used to make out Jackson's prima facie case of disparate treatment. No reasonable jury could find that the remaining six comparators, Clarke, Grace, Christy, Jones,

Cook and Reed, are similarly situated to Jackson, so they cannot support his claim of disparate treatment.

Jackson has not produced admissible evidence regarding the alleged criminal conduct or criminal charges faced by Barnes or Rosa.  Jackson alleges that Barnes faced vague "criminal charges" of some kind, but offers no further explanation of what those charges may be and cites to nothing in the record to support these claims about Barnes's alleged criminal history.  As to Rosa, while the Defendants admit certain details surrounding his history of DUI convictions and incarceration, they cite to an exhibit that does not exist.  Jackson cites only to multiple pages of Voccola's deposition transcript, but the cited pages do not refer to Rosa's alleged convictions and merely repeat Voccola's conclusory accusations from his complaint in *Voccola v. Rooney*, 136 F. Supp. 3d 197 (D. Conn. 2015).[10]  Even if Voccola's testimony discussed Rosa's alleged criminal history in detail, it is unclear how Voccola gained personal knowledge of these matters short of learning about them from another person, and any testimony he provided would therefore likely be based on inadmissible hearsay.  *See United States v. Groysman*, 766 F.3d 147, 156 (2d Cir. 2014) (holding that law enforcement agent witness who testified as to occurrences at meetings he did not personally attend was "conveying information that he learned from debriefing the cooperators and was thus conveying inadmissible hearsay"); *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 57 (2d Cir. 1993) ("A person may have personal knowledge of a hearsay declaration; but that does not make it admissible. [The witness] could have gained personal knowledge (and likely did) from . . . conversations with others.")  There is therefore no admissible evidence in the record regarding the alleged criminal records of either Barnes or Rosa, and Jackson cannot rely on these comparisons to make out his prima facie case.

---

[10] Mr. Jackson cites to 17 different pages of Voccola's deposition transcript, only one of which refers to Mr. Rosa by name.  None of these 17 pages discuss Mr. Rosa's alleged DUI convictions.

Any comparator would need to be "similarly situated in all material respects" to Jackson if he is to make out a prima facie case for disparate treatment.  *Mandell*, 316 F.3d at 379.  Jackson's underlying conduct, for which he was arrested and faced criminal charges, involved acts of dishonesty, as he made false statements to the police and false insurance claims.  He did not confess his wrongdoing or begin paying restitution to the insurance companies until the police confronted him months later.  His criminal conduct received considerable local news media attention, which, according to Fire Chief Rooney, caused considerable public embarrassment to the BFD and eroded public trust in the BFD.  Jackson elected to say nothing during his initial investigation hearing on June 4, 2012, and he did not provide any explanation of his conduct until his administrative due process hearing on June 14, 2012, where he confessed and apologized, but also gave inconsistent statements about whether a social acquaintance had advised him to pad his insurance claims or whether a colleague had simply told him that the insurance company would require careful records.  At a minimum, in order to allow Jackson to make out his prima facie case, a comparator would need to have been arrested for similar misconduct, faced criminal charges, received similar publicity for his wrongdoing, attempted to shift blame to others, and lacked any mitigating explanation for his conduct.

Of the remaining six Black employees that Jackson points to as possible comparators for his disparate treatment claim, the record lacks evidence from which a reasonable juror could infer that any of them are similarly situated to him.  Based on the record, Clarke, Grace, and Christy were never arrested in relation to their disciplinary problems and faced no criminal charges, unlike Jackson.  Furthermore, their misconduct occurred on duty, while Jackson's misconduct occurred off-duty.  Therefore, they are not similarly situated to Jackson.

20

Similar to Jackson, Jones, Cook, and Reed were arrested for conduct occurring off-duty. None of these potential comparators, however, had similar criminal charges as Jackson, and therefore they cannot be used to make out Jackson's prima facie case.  *See, e.g., Ruiz*, 609 F.3d at 495 ("Finally, none of the employees Mr. Ruiz cites as comparators were accused of sexual harassment, sexual abuse and rape.").  There also is no record evidence that any of these three confessed unambiguously to extensive dishonesty and wrongdoing, the way that Jackson did. Indeed, for Jones and Cook, there are no transcripts for any of the disciplinary proceedings against either of them.

While there is a transcript for Reed's investigation hearing, rather than confess to culpable conduct, Reed argued that there were mitigating circumstances regarding his criminal charges.  Reed also did not provide inconsistent testimony or attempt to shift blame for his actions onto another person.  Significantly, Reed also testified in his investigation hearing, while Jackson remained silent until his formal due process hearing.

Moreover, for all of these alleged comparators, there is no evidence in the record that that any of these individuals were the subject of extensive local media coverage that could cause public criticism of the BFD and therefore, erode public trust in the BFD.  *See* Termination Letter, Def.'s Ex. 1, ECF No. 32-3 (noting the need for public "trust and confidence in your presence when entering their homes and businesses").

No reasonable jury could find that Jones, Cook, or Reed were similarly situated to Jackson because none of them faced similar criminal charges, confessed to similar degrees of wrongdoing in their disciplinary proceeding or received extensive news coverage of their alleged wrongdoing that could have eroded public trust.   Jackson therefore cannot make out his prima facie case, and summary judgment is granted to the Defendants on the Title VII and Section

1983 equal protection claims based on disparate treatment in Jackson's termination.  *See Ruiz*, 609 F.3d at 495 ("Because Mr. Ruiz has not identified a similarly-situated employee who faced equally serious allegations and whom Commissioner Walsh-Tozer allowed to remain on the job, Mr. Ruiz has failed to raise an inference of discrimination.").

### 2.      Hostile Work Environment

Jackson also argues that the Defendants subjected him to a hostile work environment by investigating him, conducting the administrative hearing, and subsequently terminating him.  To make out a hostile work environment claim, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  This requires showing both that the conduct at issue is "severe or pervasive enough that a reasonable person would find it hostile or abusive" and that the victim "subjectively perceive[d] the work environment to be abusive."  *Id.* at 321.

No reasonable jury could find that the BFD's procedure of placing Jackson on "administrative leave, conducting an internal investigation, holding a disciplinary hearing, and subsequently terminating him" created a hostile working environment because these procedures are "rights, not abusive burdens." *Voccola*, 136 F. Supp. at 207 (finding that BFD did not create a hostile working environment when investigating and terminating Caucasian firefighter for poisoning his neighbors' water filtration system); *see also Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("We agree that an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner.")  Furthermore, where "allegedly discriminatory acts were all

part of an isolated disciplinary incident," the sequence of events will, "standing alone," be insufficient to allege a hostile work environment. *Johnson v. D.C.*, 49 F. Supp. 3d 115, 120-21 (D.D.C. 2014) (dismissing plaintiff's hostile work environment claim based solely on disciplinary hearing and subsequent termination).

Because the only acts that Jackson points to as a possible basis for his hostile work environment claim arose entirely in the context of his experience with BFD's investigation, administrative hearing, and his subsequent termination, he cannot make out a hostile work environment claim. The Court grants summary judgment on his Title VII and Section 1983 equal protection claims to the extent they are based on allegations that Defendants created a hostile work environment.

### 3.     Retaliation

Retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* framework. To make out a prima facie case for a retaliation claim, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). Once the plaintiff meets this burden, the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 164. The plaintiff must then show that "retaliation was a substantial reason for the adverse employment action," and can do so by showing that "a retaliatory motive played a role in the adverse employment action even if it was not the sole cause." *Id.* (internal quotation marks omitted).

While Jackson's complaint alleges that, during the course of the investigation and administrative hearing process, he "complained that he was being treated unfairly and more harshly" than other BFD employees who "engaged in conduct significantly more serious" than his own, he does not point to facts in the record to allow him to make out any aspect of a prima facie case of retaliation.  Compl. ¶¶ 25, 28, ECF No. 1.  Jackson points to no facts in the record that could reasonably support an inference that he made complaints alleging racial discrimination in the BFD's disciplinary processes to Fire Chief Rooney, Deputy Fire Chief Grace, or the BFD. In the absence of facts showing that Jackson participated in protected conduct, there is nothing that Defendants could retaliate against him for.  No reasonable jury could find that Jackson has even a prima facie case for a retaliation claim.  The Court therefore grants summary judgment on his Title VII and Section 1983 equal protection claims to the extent they are based on allegations of retaliation.

### B.    Due Process Clause

To show that his procedural due process rights were violated, a plaintiff must "first identify a property right, second show that the government has deprived him of that right, and third show that the deprivation was effected without due process."  *J.S. v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013) (internal quotation marks omitted).  The parties do not dispute that the plaintiff has a property interest in his continued employment with the BFD.  If a plaintiff has a property interest in his public employment, constitutional due process requires only that the plaintiff receive "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" prior to termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *see also Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 212 (2d Cir. 2002).

Jackson's brief does not explain the basis for his Section 1983 claim based on constitutional due process violations.  As his entire case rests on allegations about the BFD's investigation, due process hearing, and his subsequent termination, the Court assumes that his due process claim is based on alleged deprivations of due process in relation to those events. Jackson received written notice of the charges against him in the June 8, 2012 letter, which explained that he was charged with violating the City of Bridgeport Code of Ethics, particular sections of the BFD Rules and Regulations, and particular sections of the City of Bridgeport Work Rules and Regulations.  Due Process Hearing Letter, Def.'s Ex. 6, ECF No. 32-3.  The evidence of his underlying conduct was discussed at the administrative hearing on June 14, 2012, and Jackson had the opportunity to explain his side of the story.  Due Process Hearing Trans., Def.'s Ex. 7, ECF No. 32-3. Jackson therefore received all the due process protections required by law in the investigation and hearing that led to his termination.

Jackson's complaint included the allegation that Fire Chief Rooney "threatened [him] with termination in an attempt to coerce him into giving up" his "constitutional right to remain silent."  Compl. ¶ 23, ECF No. 1.  Even assuming that this is a fair characterization of the June 8, 2012 letter informing Jackson that he needed to attend the administrative hearing or potentially face disciplinary consequences including termination, the City of Bridgeport may compel incriminating testimony from public employees or contractors if "neither it nor its fruits are available" for use in a criminal trial. *Lefkowitz v. Turley*, 414 U.S. 70, 84 (1973).  Jackson received a *Garrity* warning at the June 14, 2012 administrative hearing, which provided that his testimony could not be used in subsequent criminal proceedings, and he acknowledged that he understood it.  Due Process Hearing Transcr. at 2, Def.'s Ex. 7, ECF No. 32-3.  Summary judgment is therefore granted to Defendants as to Jackson's due process claims.

### C.      Municipal Liability

Jackson's municipal liability claim is a *Monell* claim against the City of Bridgeport, alleging that it had a policy of deliberate indifference to his constitutional rights because non-Caucasian firefighters were treated less harshly.  Pl.'s Br. at 41-42, ECF No. 42-1.  Under Section 1983, a municipality may be sued if its "policy or custom" inflicts constitutional injury. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  To show that such a policy or custom of discrimination exists, the plaintiff could either point to an "express rule or regulation" or show that "a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials."  *Littlejohn*, 795 F.3d at 314-15.

Furthermore, municipal defendants can generally only be held liable for constitutional violations if the individual defendants are first found liable for such violations.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ( "[The municipal defendants] were sued only because they were thought legally responsible for [individual municipal employee's] actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent."); *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008) (holding that if individual defendants did not violate plaintiff's rights "the City cannot be liable to [plaintiff] under § 1983, regardless of whether the officers acted pursuant to a municipal policy or custom").  *Monell* liability exists in the absence of individual liability only if "the injuries complained of are not solely attributable to the actions of named individual defendants," *Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999), or if individual

defendants are found not liable because of qualified immunity, *Curley v. Vill. of Suffern*, 268

F.3d 65, 71-72 (2d Cir. 2001) .

Because neither Fire Chief Rooney nor Deputy Fire Chief Grace can be found liable for

violating Jackson's constitutional rights under the equal protection or due process clauses, as

explained above, the municipal Defendant cannot be liable under Section 1983 and *Monell*.

Summary judgment is therefore granted in favor of the City of Bridgeport as to the Section 1983

claims against it.

### D.      Connecticut State Law Claims

Jackson also brings claims under Connecticut state law, including a claim under the

CFEPA and negligent supervision and intentional infliction of emotional distress claims under

Connecticut common law.  As explained above, the Court grants summary judgment in favor of

Defendants on all of Jackson's federal claims.  The Court declines to exercise supplemental

jurisdiction over his state law claims.  *See* 28 U.S.C. § 1367(c) ("The district courts may decline

to exercise supplemental jurisdiction over a claim . . . if . . . (3) the district court has dismissed all

claims over which it has original jurisdiction."); *Kolari v. New York–Presbyterian Hosp.*, 455

F.3d 118, 122 (2d Cir.2006) ("[I]n the usual case in which all federal-law claims are eliminated

before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the

remaining state-law claims.").

## IV.     CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Summary Judgment is

**GRANTED** as to Counts One, Two, Three, and Seven of Plaintiff's Complaint.  The Court

declines to exercise supplemental jurisdiction over the remaining state law claims in Counts

Four, Five, and Six of Plaintiff's Complaint.

The Clerk is directed to enter judgment in favor of the Defendants and close this case.

SO ORDERED at Bridgeport, Connecticut, this 13th day of September, 2016.


   /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge